800 So.2d 259 (2001)
James KNOWLES, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-4646.
District Court of Appeal of Florida, Second District.
October 10, 2001.
Rehearing Denied November 13, 2001.
*260 Richard J. D'Amico, Special Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Patricia E. Davenport, Assistant Attorney General, Tampa, for Appellee.
CASANUEVA, Judge.
James Knowles appeals his conviction for the first-degree murder of his former wife, alleging that the trial court erred in three respects. First, he asserts that the trial court erred by refusing to direct a verdict in his behalf because the State failed to prove premeditation, and, second, that it was error to replay almost, but not all, of an audiotape to the jury. Neither of these points has merit.
The third issue, however, is not only the most difficult but also the most significant. Mr. Knowles contends the trial court erred by permitting the State to call in its case the clinical psychologist whom the defense had retained to determine Mr. Knowles's sanity at the time of the offense. Mr. Knowles, at trial as well as on appeal, has asserted that either his privilege against self-incrimination or his attorney-client privilege, or both, were violated by permitting his clinical psychologist expert to relate his confidential statements to the jury. We first conclude that the errors were properly preserved by objection, but even if not, because the violation of the privilege against self-incrimination is a fundamental error, the issue is subject to review. Although Mr. *261 Knowles's contention is meritorious, under the unique facts of this case, we conclude the error is harmless.

The Initial Plea
On September 19, 1994, Mr. Knowles went to the workplace of his former wife, Tina Knowles, where he shot and killed her. A grand jury indicted him on one count of first-degree murder and two counts of aggravated assault with a firearm based on the September 19 events. Later, Mr. Knowles, pursuant to a plea offer to the lesser charge of second-degree murder and two counts of aggravated battery with a firearm, entered a plea that was accepted by the court. At the sentencing proceeding, the defense called Dr. Joel B. Freid, a clinical psychologist, to testify regarding Mr. Knowles's state of mind prior to the homicide. Dr. Freid opined that Mr. Knowles, although not legally insane, was very depressed, suicidal, despondent, and frustrated. Further, Mr. Knowles exhibited a dependent personality and relied upon others for emotional support and direction.
During cross-examination at that sentencing hearing, the State inquired into several limited areas: when a "triggering conversation" between the victim and the defendant occurred; whether the witness had been provided with police reports containing statements made by the defendant (he had); and how those statements might indicate the defendant's homicidal tendency. The State also cross-examined the expert regarding the defendant's statement that he did not think about homicide until the day before the event and inquired into Dr. Freid's opinion that the defendant had an emotionally dependent personality.
Later, knowing that a successful relief application would subject him to trial on first-degree murder charges, Mr. Knowles established in a postconviction proceeding, that his counsel failed to advise him properly prior to entering his plea. Finding that the motion was valid and that both prongs of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), had been met, the court vacated the conviction and sentence and reinstated his plea of not guilty. Mr. Knowles then went to jury trial on the original charges including first-degree murder.

The Trial
In order to prove the charges against Mr. Knowles, the State introduced evidence regarding the victim's relationship with Mr. Knowles, the events leading to September 19, 1994, and the events of that fateful day.
The victim and Mr. Knowles first married each other in 1981, divorced two and a half years later, remarried in 1991, and divorced again in 1994. However, they continued to reside together until July 6, 1994. They had two children.
In an effort to reconcile, Mr. Knowles went to Tina Knowles's place of business bearing roses. The attempt to revive their relationship failed. Shortly thereafter, a shot that sounded like an explosion rang out. One witness believed he heard Tina saying just before the shot, "No, Jimmy, no." Immediately, Brian Carson and Kurt Smith ran to Tina's office and began wrestling with Mr. Knowles for possession of the firearm. Later, Robert Christian joined the fray and was successful in removing the firearm from Mr. Knowles's possession. Either during or shortly after the altercation, Mr. Knowles stated he wanted to kill himself. Apparently, this was not immediately possible because the weapon had "stovepiped"; that is, a casing had blocked the slide and jammed the gun. The victim had been shot once and died at the scene.
*262 Just days before the murder Mr. Knowles had given his niece a written document that designated the custodian of the children in the event of both parents' deaths. He also left other documents including a handwritten will.
Two audiotapes made by Mr. Knowles before the homicide were admitted into evidence and published to the jury. In a tape left for his niece, Mr. Knowles made a number of statements including:
I just can't handle it anymore.
I don't want you to cry over me.
They're [the children] gonna lose the two of us. I'm not going by myself. Let them understand that I really did not mean to cheat them out of a father and mother.
Don't try to explain my actions to nobody. There is no explanation for my actions. This is just something that I have decided that I have to do to be at peace with myself.
During the trial the State advised the court of its intention to call Dr. Freid to testify in its case-in-chief on the issue of premeditation. The defense objected, contending that Dr. Freid's testimony should be barred because it flowed directly from a defective plea which, furthermore, had been judicially vacated. In response to the State's argument that the defendant had voluntarily waived any privilege regarding Dr. Freid's testimony by presenting it at the prior sentencing, the defense reiterated that the expert testimony came from a tainted process and that Mr. Knowles was entitled to be returned to his position prior to his change of plea, with all privileges remaining intact. The trial court, however, found that the there had been a voluntary waiver of the privilege in accord with section 90.507, Florida Statutes (1993), and permitted the State to call Dr. Freid and inquire into matters the defendant had mentioned to him.
Dr. Freid testified that he had been initially retained to evaluate whether Mr. Knowles met the requirements of legal insanity. To that end, he reviewed documents that had been provided, administered a battery of psychological tests, and, importantly, interviewed Mr. Knowles. Dr. Freid's testimony established a number of points: first, that Mr. Knowles had made plans to kill both his ex-wife and himself prior to the actual shooting; second, that Mr. Knowles pulled out a gun and shot his ex-wife after she had commented on the roses he had just presented to her, and that he had then immediately tried to kill himself but could not because the gun jammed; and third, that Mr. Knowles was legally sane at the time of the offense and knew his conduct was wrong.

Analysis
Florida Rule of Criminal Procedure 3.216(a) authorizes the appointment of an expert to assist defense counsel in determining whether the accused was legally insane at the time of the offense. Dr. Freid was appointed for this purpose. The rule also provides that the appointed expert "shall report only to the attorney for the defendant and matters related to the expert shall be deemed to fall under the lawyer-client privilege." The privilege is codified at section 90.502(2), Florida Statutes (1993), which provides that a client, such as Mr. Knowles, has a "privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications." It is not contested that the matters discussed by Dr. Freid and Mr. Knowles are protected by this privilege, and the assertion of the privilege is based on the fact that confidential communications had been made. See Rose v. State, 591 So.2d 195, 197 (Fla. 4th DCA 1991).
*263 Historically, the rule was a codification of Pouncy v. State, 353 So.2d 640 (Fla. 3d DCA 1977), and has since been interpreted to mean that "the state could not make a confidential expert its witness when the attorney/client privilege had not been waived." Lovette v. State, 636 So.2d 1304, 1307 (Fla.1994). Accordingly, our supreme court has continued to hold that "the state cannot elicit specific facts about a crime learned by a confidential expert through an examination of a defendant unless that defendant waives the attorney/client privilege by calling the expert to testify and opens the inquiry to collateral issues." Id. at 1308; see also Morgan v. State, 639 So.2d 6 (Fla.1994).
Florida Rule of Criminal Procedure 3.172 requires that an accused's plea must be made both knowingly and voluntarily. The failure of a plea to meet each criterion renders the plea subject to a postconviction attack. Here, Mr. Knowles challenged his plea on the basis of the ineffective assistance of his counsel in failing to advise him properly on matters pertaining to the duration of his potential prison sentence. The trial court found that the failure to provide proper legal advice met the two-prong test of Strickland v. Washington and set aside the plea. The court's ruling determined that Mr. Knowles's plea had not been knowingly entered and, thus, was not voluntarily made. Consequently, his former plea of not guilty was reinstated.
There is no question that the testimony of Dr. Freid followed an involuntarily entered plea and was the direct consequence of the plea. Without the plea there would have been no sentencing proceeding. Under these facts, there has been no voluntary waiver of Mr. Knowles's privilege. Where the attorney-client privilege has not been waived, the State cannot make a confidential expert for the defense its witness. Sanders v. State, 707 So.2d 664, 669 (Fla. 1998).
Where the defendant calls the confidential expert to testify, the general rule, as previously noted, concludes that the privilege is waived. Sagar v. State, 727 So.2d 1118, 1119 (Fla. 5th DCA 1999). However, this unusual case is distinguishable from those following the general rule. Here, the waiver was the product of the ineffective assistance of counsel, rendering not only the plea but the waiver involuntary. Furthermore, because the plea was set aside, the former sentencing hearing was rendered a nullity, along with everything that occurred at that hearing. Thus, there was no legal waiver of the privilege.
The Supreme Court of Florida has also recognized that permitting a rule 3.216 confidential defense expert witness to testify over defense objection violates a defendant's privilege not to incriminate himself or herself. In Lovette, 636 So.2d at 1308, the State called the court-appointed defense expert. The court found that even though Lovette voluntarily submitted to an examination, he never called the expert as a witness. Thus, the door had not been opened for the State to question the expert about any facts of the crimes that Lovette may have told him. Id.
Like Lovette, the record in this case does not disclose a waiver of the privilege against self-incrimination. In most instances the acceptance of a valid plea provides the waiver of this constitutional right. Here, however, there was no valid plea and thus no valid waiver. To hold Mr. Knowles to a waiver of his privilege based upon the ineffective assistance of his counsel is both incongruous and illogical. "The Constitution does not shield against incrimination by voluntary statements, even if given in pursuit of a collateral issue such as insanity; it does, *264 however, shield against the unfair use of such statements." Parkin v. State, 238 So.2d 817, 821 (Fla.1970). Even assuming that Mr. Knowles's statements made through Dr. Freid were voluntary, the constitutional privilege against self-incrimination provided by both the state and federal constitutions protects him from the unfair use of that now set-aside sentencing testimony.
For these reasons, it was error for the trial court to admit Dr. Freid's testimony.

Harmless Error

I.
Having concluded that the trial court erred by admitting Dr. Freid's testimony, this court must next ascertain whether this error mandates a reversal.
As the beneficiary of the error, the State carries the burden to prove beyond a reasonable doubt that the error is harmless; that is, that it did not contribute to the verdict or that there is no reasonable possibility that the error affected the conviction. This determination must be grounded on the court's examination of the entire record. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
Recently, our supreme court expounded upon the DiGuilio harmless error analysis in Goodwin v. State, 751 So.2d 537 (Fla. 2000). There the court categorized errors into at least two types. The first consists of "constitutional errors" such as those described in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and the second consists of errors so serious that they are "presumptively harmful." Goodwin, 751 So.2d at 542. In this case the violation of the privilege against self-incrimination has a profound impact upon Mr. Knowles's constitutional right. Similarly, the violation of his attorney-client privilege is "presumptively harmful." Each directly affects an accused's basic due process right to a fair trial.
Goodwin mandates that the analysis must focus on how the error affects the trier of fact. Id. at 541. It would be inappropriate to uphold the jury verdict of guilty in this case by concluding that the permissible evidence alone would support the verdict. Instead, the conceptual framework for reviewing the record in its entirety is provided by the answer to the following question: "Do I, the judge, think that the error substantially influenced the jury's decision?" Id. at 545 (quoting O'Neal v. McAninch, 513 U.S. 432, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

II.
A review of the record has convinced this court that the error did not substantially influence the jury's verdict and, therefore, upon the unique facts of this case, the error is harmless beyond a reasonable doubt.
As to the matters improperly placed before the jury through the use of Dr. Freid's testimony, the record contains equally compelling evidence from other sources-notably through Mr. Knowles's own voice.
Finally, Dr. Freid testified that Mr. Knowles was legally sane at the time of the offense and knew the wrongful nature of his conduct. Mr. Knowles's defense was not insanity but rather that he possessed a level of intent lower than premeditation. The defense, implicitly if not explicitly, conceded the wrongful nature of his conduct by seeking a conviction for a lesser crime. Further, the law presumes Mr. Knowles to be sane, so Dr. Freid's testimony on this point did nothing more than confirm a legal presumption that had not been challenged or placed in issue for the jury to resolve.
*265 Another important consideration is that Mr. Knowles testified on his own behalf, and the record contains no indication that he did so because of the trial court's error. A careful examination of his direct testimony reveals nothing indicating that at the time of the murder he was depressed or suffering from any form of emotional disturbance. Thus, the evidence supporting the defense theory that Mr. Knowles lacked premeditation or acted on any other level of intent came from Dr. Freid's testimony on cross-examination that Mr. Knowles was "emotionally disturbed," "depressed," and in fact "very depressed." Thus, Mr. Knowles received the benefit of Dr. Freid's testimony to underscore his lack of culpability without having to call him to the witness stand and thereby forfeiting his ability to give the first and last closing arguments.
For these reasons, the error was harmless and Mr. Knowles's convictions are affirmed.
GREEN, J., Concurs specially.
BLUE, C.J., Dissents with opinion.
GREEN, Judge, Concurring.
I agree with Judge Casanueva that the error in admission of Dr. Freid's testimony did not substantially influence the jury's verdict and is harmless beyond a reasonable doubt. I believe, however, that the defense attorney waived his client's psychotherapist-patient privilege.
Mr. Knowles's counsel did not object to Dr. Freid's testimony at trial. The transcript supports the conclusion that while defense counsel vacillated with respect to whether he should object, his final exchange with the state attorney indicates a clear waiver. The concluding statements are as follows:
MR. HARB [prosecuting attorney]:... What I can do at this point is not call Dr.let me go ahead and do that, as a matter of fact, not call Dr. Freid, okay, and I will just have him wait outside for rebuttal, depending what the defendant testified. I believe if the defendant takes the stand and testifies regarding factual issues, if he deviates from statements he made to Dr. Freid and so forth regarding the facts, I will call Dr. Freid as a rebuttal witness, just to be on the safe side. I believe I'll be on the safe side even if I call him at this point to testify to what the defendant told him, because it's the confidentiality has been waived.
MR. ANDERSON [defense counsel]: Well, and, you know, as I told Mr. Harb, I don't make these decisions instantaneously, unless I'm forced to, and I decided to make this objection just in the last few minutes, but obviously I've been thinking about it. I don't have any objection to the doctor's testimony, provided that none of this factual information is brought into it. You know, in other words, I don't know how you'd do that.
THE COURT: He wouldn't be calling the doctor for anything other than the question of, Doctor, when did he form the intent to kill, and Mr. Castillo covered it fairly well in front of Judge Roberts, and that was no earlier than Sunday andno later than Sunday and no earlier than Saturday.
MR. ANDERSON: Well, I wanted to have my cake and eat it too.
THE COURT: That's the only reason he called Dr. Freid.
MR. ANDERSON: That's fine. What Mr. Harb suggests is fine.
THE COURT: Well, you tryboth of you try your own case, but I am finding that in accord with Section 90.507 there has been a voluntary waiver of the [sic] either psychotherapist privilege or attorney/client privilege and rights against *266 self-incrimination. Dr. Freid can be called to testify and he can be called to testify regarding what the defendant told him was in his mind.
MR. HARB: Okay. I'll be calling Dr. Freid, Your Honor.
THE COURT: Bring them in.
Defense counsel, Mr. Glen Anderson, made no objection during the testimony of Dr. Freid and, therefore, must have been satisfied that his concern was allayed.
Mr. Anderson's sole contention was the same as that being advanced by Judge Casanueva and Chief Judge Blue, to wit: it is simply unfair for the trial judge to have allowed Dr. Freid's testimony in light of the circumstance that the plea and sentencing proceeding must be viewed as if nothing occurred. It seems to me that they are carving out a new exception to the waiver of privileges, based upon equity principles.
It should be understood that there was no physician-patient communication privilege under the common law of Florida. The supreme court has stated: "At common law no privilege existed as to communications between physician and patient, and the privilege is of statutory origin in every state in which it obtains." Fla. Power & Light Co. v. Bridgeman, 133 Fla. 195, 182 So. 911, 919 (1938) (citation and internal quotation marks omitted). The Florida Legislature, by passage of sections 90.502, 90.503, and 90.507, Florida Statutes (1995), has since provided for the lawyer-client, psychotherapist-patient privileges and the waiver of these privileges. Section 90.507, waiver of privilege by voluntary disclosure, states:
A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person, or the person's predecessor while holder of the privilege, voluntarily discloses or makes the communication when he or she does not have a reasonable expectation of privacy, or consents to disclosure of, any significant part of the matter or communication. This section is not applicable when the disclosure is itself a privileged communication.
When Dr. Freid testified at the sentencing hearing, the information became available to anyone in the world with an interest to review it.[1]H.J.M. v. B.R.C., 603 So.2d 1331, 1334 (Fla. 1st DCA 1992) (holding that "[o]nce this privilege has been waived, it cannot be reinvoked"); Hamilton v. Hamilton Steel Corp., 409 So.2d 1111, 1114 (Fla. 4th DCA 1982) (holding that "[i]t is black letter law that once the privilege is waived, and the horse [is] out of the barn, it cannot be reinvoked").
Judge Casanueva discusses Lovette v. State, 636 So.2d 1304 (Fla.1994). In Lovette, the court stated: "We hold, therefore, that the state cannot elicit specific facts about a crime learned by a confidential expert through an examination of a defendant unless that defendant waives the attorney/client privilege by calling the expert to testify and opens the inquiry to collateral issues." Id. at 1308.[2] The court's reference to a defendant's calling a confidential expert to testify is precisely what occurred in the instant case. Allowing the State to call and present the testimony of the confidential expert in Lovette *267 was error; whereas, the testimony of Dr. Freid at sentencing and at trial in the instant case was perfectly permissible. Regardless of the negative impact of Dr. Freid's trial testimony, I do not agree that the earlier sentencing proceeding should be treated as if nothing occurred.
I agree with Judge Casanueva that Mr. Knowles's conviction should be affirmed; however, I disagree with respect to the issue of waiver.
BLUE, Chief Judge, Dissenting.
I agree with all of the well-crafted majority opinion except I disagree that the admission of Dr. Freid's testimony constituted harmless error. Thus, I respectfully dissent. Where, as in this case, the primary issue is the defendant's premeditation, I can think of nothing more harmful than the presentation of evidence of premeditation from the defendant's psychologist. My belief that a new trial is required would not change if I agreed with the special concurrence that the error was not preserved. If the defense attorney failed to object and the admission of the testimony was not harmless, I conclude the defendant would again be entitled to a new trial based on ineffective assistance of counsel. Accordingly, I would reverse for a new trial and thus dissent.
NOTES
[1] While not an issue in this appeal, Dr. Freid was also appointed to determine whether Mr. Knowles was competent to proceed, as provided for by rule 3.210, Florida Rules of Criminal Procedure. Rule 3.211(e) specifies that the information obtained by the examining expert is waived when that information is used for any purpose other than to determine a defendant's competency to proceed.
[2] The court in Lovette v. State, 636 So.2d 1304 (Fla.1994), held that the trial court's error of allowing the State to call the confidential expert was harmless beyond a reasonable doubt.