864 So.2d 1262 (2004)
James KNOWLES, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-4646.
District Court of Appeal of Florida, Second District.
February 4, 2004.
*1263 James Marion Moorman, Public Defender, and Richard J. D'Amico, Special Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Katherine V. Blanco, Assistant Attorney General, Tampa, for Appellee.

ON REMAND FROM THE SUPREME COURT OF FLORIDA
CASANUEVA, Judge.
In this matter on remand from the Florida Supreme Court, we are required to address the following issue set forth in Knowles v. State, 848 So.2d 1055, 1059 (Fla.2003) [Knowles (II)]:
The Second District's use of the incorrect "substantial influence" test leaves us uncertain whether the application of the DiGuilio[[1]] test would have yielded a different result in the district court. Therefore, we quash the decision below and remand to the district court for reconsideration of whether the error is harmless in light of our reaffirmation in the case of the DiGuilio standard. Cf. Goodwin, 751 So.2d at 547[[2]] (remanding one of two consolidated cases to the district court to reconsider its harmless error determination).
In accordance with our mandate, we have reconsidered this case and have concluded that the State has met its burden of demonstrating *1264 beyond a reasonable doubt that there is no reasonable possibility that the error affected the verdict. Accordingly, we affirm Mr. Knowles's conviction for first-degree murder.

FACTS
For purposes of clarity, we reiterate the facts in this opinion.[3] On the morning of September 19, 1994, James Knowles, carrying thirteen roses and a gun, went to the workplace of his former wife, Tina Knowles. After a brief discussion, which Mr. Knowles characterized as an attempt to revive their relationship, he shot and killed his ex-wife. Ms. Knowles's coworkers heard a noise that sounded like an explosion; one person heard her exclaim, "No, Jimmy, no." After hearing the shot, three of Ms. Knowles's coworkers burst into the victim's office where a struggle for the firearm ensued. Prior to the struggle, Mr. Knowles attempted to take his own life with the firearm, but the gun jammed. At one point during the struggle, he asked to be let go so that he could kill himself. Ultimately, however, the coworkers took control of the gun and subdued Mr. Knowles, who was taken into custody and later indicted for first-degree murder.
The State offered Mr. Knowles a plea to the lesser charge of second-degree murder and two counts of aggravated battery with a firearm. The court accepted his plea and conducted an extensive sentencing hearing. At that proceeding, the defense called Dr. Joel B. Freid, a clinical psychologist, to testify regarding Mr. Knowles's state of mind prior to the homicide. Dr. Freid opined that Mr. Knowles, although not legally insane, was very depressed, suicidal, despondent, and frustrated. Furthermore, Mr. Knowles exhibited a dependent personality and relied upon others for emotional support and direction.
During cross-examination of Dr. Freid at the sentencing proceeding, the State inquired into several limited areas: when a triggering conversation between the victim and the defendant had occurred; whether Dr. Freid had been provided with police reports containing the defendant's statements; and to what extent the defendant's statements might indicate his homicidal tendency. The State also cross-examined Dr. Freid concerning the defendant's assertion that he did not think about the homicide until the day before the incident. At the conclusion of the hearing, the court sentenced Mr. Knowles to thirty years in prison.
Mr. Knowles's initial conviction was vacated after a postconviction relief hearing on the grounds of ineffective assistance of counsel. Mr. Knowles's prior counsel failed to advise him of the amount of gain time that he would receive during his incarceration. Finding that counsel was ineffective under the standards of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court vacated the conviction and sentence and reinstated Mr. Knowles's plea of not guilty.
At his trial for first-degree murder, the evidence demonstrated that Mr. Knowles and the victim were married for the first time in 1981. They were divorced approximately two years later but continued to live together. During their marriage they had two sons. They remarried in 1991, were divorced again in 1994, and continued to live together until July 6, 1994.
The murder occurred on September 19, 1994, when the events described above occurred. *1265 Mr. Knowles testified at trial that his wife had been unfaithful to him during their marriages, but he still loved her. He wanted to forgive her and reunite. Prior to going to his ex-wife's office on September 19, 1994, Mr. Knowles had purchased thirteen roses, one for each year of their relationship, and brought them with him to her office. He asked his wife to take him back, but she refused. She told him about her relationships with other men, some of whom were Mr. Knowles's friends, and she stated that he would never be able to forgive her for her actions. According to Mr. Knowles's trial testimony, Tina Knowles stated that "it wasn't just the one person, there's been others, and some of them are friends of yours, and when you find this out, we're going to go through all this again." Then, according to Mr. Knowles, "somewhere about that point I told her I loved her very much and I shot and killed her."
For two or three days prior to the shooting, Mr. Knowles had made arrangements for the handling of various affairs. He was not sure when this planning stage begansimply that he knew that he needed to "do something else." On cross-examination, Mr. Knowles agreed that if Tina had come back to him, he would not have killed her. He had unilaterally planned a reconciliation but admitted that "if that didn't happen, I knew I was going to die ... and possibly Tina also." He admitted knowing that he had the gun with him (hidden by the bouquet of roses) when he went to see Tina and that it was his plan for Tina to die first.
His niece, Katherine Shockley, testified that shortly before the murder Mr. Knowles had given her a document designating her custodian of the boys in the event of the death of both of their parents. She stated that Mr. Knowles did not indicate that he intended to kill his wife, but he asked that she distribute certain guns to his boys. He left an undated, handwritten will, a note about payment for completion of work, a note about checks that were owed to him from his employer, and a temporary tag and lease agreement for a pickup truck. These items were recovered at his home pursuant to a search warrant.
Also recovered pursuant to the warrant were two audiotapes that were played to the jury in their entirety. In the tapes Mr. Knowles left certain instructions concerning the handling of his affairs after his death. In the first tape, he alluded to the fact that his boys would lose "two of us" that he was "not going alone." He declared: "This is just something that I have decided that I have to do to be at peace with myself. I cannot be hurt anymore and will not be hurt anymore." The second tape contained the following statement: "I cannot handle this and have not handled it well at all. I just love Tina so much until I can't go on without her."
Finally, Dr. Freid testified, over defense objections, as the State's expert during the guilt phase of the trial. Dr. Freid testified as to Mr. Knowles's state of mind prior to the murder: he was depressed, quite upset, and especially disturbed about learning certain things about his wife's behavior. Therefore, Mr. Knowles developed an elaborate suicide plan. A couple of days later, however, Mr. Knowles changed his plans to include taking his wife's life as well as his own, and he made two audiotapes in which he recorded his intentions. On cross-examination, Dr. Freid reiterated that, in his opinion, Mr. Knowles was emotionally disturbed, very depressed, and struggling with the thought of losing his wife forever by divorce.

ANALYSIS
In our previous opinion we discussed whether the defendant waived his *1266 privilege against self-incrimination or attorney-client privilege when he called Dr. Freid as a witness in the first sentencing proceeding. We concluded that Mr. Knowles did not waive those privileges for the purposes of a second trial because the first proceeding was rendered a nullity along with everything that occurred at that proceedingwhen the court granted Mr. Knowles's postconviction relief motion and vacated his plea and sentence. See Knowles (I), 800 So.2d at 262-63. The majority opinion concluded that the error in admitting Dr. Freid's testimony, however, was not per se reversible, a conclusion that was affirmed by the Florida Supreme Court in Knowles (II), 848 So.2d at 1059 ("In remanding, we also reject Knowles's assertion that the erroneous admission of an expert witness's testimony bearing on intent is per se harmful error."). In accordance with the mandate, our analysis will focus only upon whether the error in admission of Dr. Freid's testimony was harmless under the standard set out in DiGuilio, 491 So.2d at 1137.
At the outset, we recognize that "the admission of testimony in violation of a defendant's attorney-client privilege and privilege against self-incrimination creates a high probability of harm." Knowles (II), 848 So.2d at 1059. Nevertheless, in this unique circumstance, we are convinced beyond a reasonable doubt that the error did not affect the first-degree murder verdict. In reaching that conclusion we have applied the harmless error test as set out in DiGuilio, 491 So.2d at 1135, which "requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict."
We have already recited the permissible evidence that led to Mr. Knowles's conviction. Substantial, independent evidence of Mr. Knowles's premeditation emanated from the permissible evidence adduced, most notably from Mr. Knowles's own letters, audiotapes, and statements. Mr. Knowles's own testimony, as well as his written statement and audiotapes, revealed that, although he purportedly hoped for a reconciliation with his ex-wife, he simultaneously planned and expected to commit a murder/suicide. His focused and deliberate actions were inconsistent with a killing on the spur of the moment. See Spencer v. State, 645 So.2d 377 (Fla.1994). "Premeditation may be established by circumstantial evidence, including the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Holton v. State, 573 So.2d 284, 289 (Fla.1990) (cited in Spencer, 645 So.2d at 381).
Both the audiotapes and his actions on the day of the murder confirmed Mr. Knowles's careful consideration of the murder/suicide plan. He made a will, arranged for custody of his soon-to-be orphaned sons, and made plans to dispose of some of his property. On the morning of the murder, Mr. Knowles calmly had coffee in a restaurant he frequented, purchased roses for his ex-wife and refused the suggestion that the florist deliver them, and walked into Tina Knowles's workplace with the gun concealed by the roses. He shot her once in the chest.
Admittedly, Dr. Freid testified about the moment at which Mr. Knowles might have formed an intent to murder his wife. But Dr. Freid also testified that Mr. Knowles was depressed, despondent, and upset, and that he hoped for reconciliation with his *1267 wife. Thus, the basic thrust of Dr. Freid's testimony was ameliorative. This is demonstrated not only by the fact that he was originally called as a defense witness at the first sentencing hearing in order to persuade the judge that Mr. Knowles's intent was less than full-blown premeditation, but also by the fact that the very last reference in the defense closing argument was to Dr. Freid's testimony:
Now, he [the prosecutor] would have you believe that there was an elaborate plan. Well, the fact is, the evidence shows, that there were a number of plans, including the plan to wrap the pickup truck around the tree. Remember when Dr. Freid talked about how it was normal in situations like this to grasp at straws? That's what Dr. Freid said, that when you're in love, really in love, you seize every opportunity to believe that ultimately you're going to be successful. That's what the expert said. I suggest we believe him, and believe that he believed, right until the last minute, that he would succeed. Thank you.
As we stated in our opinion in Knowles (I), Dr. Freid testified that Mr. Knowles was legally sane at the time of the offense and knew that his conduct was wrong. However, Mr. Knowles's defense was not insanity but that he possessed a level of intent lower than premeditation. The defense, implicitly if not explicitly, conceded the wrongful nature of his conduct by seeking a conviction for a lesser crime. And, because the law presumes Mr. Knowles to be sane, Dr. Freid's testimony on this point only confirmed a legal presumption that was not before the jury to resolve. Knowles (I), 800 So.2d at 264.
We went on to observe in Knowles (I) that the record contained no indication that Mr. Knowles's decision to testify was induced by the admission of Dr. Freid's testimony. Furthermore, an examination of Mr. Knowles's testimony reveals nothing suggesting that he was depressed or emotionally disturbed. The crucial evidencefor Mr. Knowlesconcerning his mental state (that he was "emotionally disturbed," "depressed," and in fact "very depressed") was elicited from Dr. Freid. Mr. Knowles thus benefitted from the advantageous aspects of Dr. Freid's testimony without sacrificing his right to give the first and last closing arguments. Knowles (I), 800 So.2d at 265.
DiGuilio suggests that an appellate court must look at the quality of both permissible and impermissible evidence, not simply the comparative weight of each. In the DiGuilio case, 491 So.2d at 1138, the court noted that the "permissible evidence was not clearly conclusive" and that the impermissible evidence, "at least indirectly... highlighted for the jury the fact that DiGuilio was not testifying at trial and still had offered no plausible explanation" (for his presence in the middle of a drug deal). Here, the permissible testimony was conclusive. The defendant admitted that he took a loaded gun and shot his ex-wife. Although this originally might have been part of a murder/suicide plan, Mr. Knowles admitted that he intended to shoot Tina first and that if she had agreed to reconcile, he would not have killed her. Mr. Knowles left behind both audiotapes and written statements concerning his criminal intentions. In the face of this evidence, we are convinced beyond a reasonable doubt that Dr. Freid's testimony highlighting as it did the defendant's theory of his casedid not affect the jury's decision to convict Mr. Knowles of first-degree murder.
Affirmed.
*1268 VILLANTI,[4] J., and GREEN, OLIVER L., Senior Judge, Concur.
NOTES
[1] State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
[2] Goodwin v. State, 751 So.2d 537 (Fla.1999).
[3] This discussion of the facts essentially tracks this court's original opinion in Knowles v. State, 800 So.2d 259, 261-63 (Fla. 2d DCA 2001) [Knowles (I)], but we have expanded upon the recitation to some degree in order to fulfill the mandate.
[4] Judge Villanti was substituted for Judge Blue, who was on the Knowles (I) panel but has since retired from the court.